IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JUDITH A. BEASLEY,

              Plaintiff,

          vs.                                 Case No. 04-1069-JTM

RAYTHEON AIRCRAFT COMPANY,
RAYTHEON AIRCRAFT COMPANY
RETIREMENT INCOME PLAN FOR
HOURLY PAID EMPLOYEES, and THE
COMMITTEE,

              Defendants.

## MEMORANDUM AND ORDER

This matter comes before the court on the parties' cross-motions for summary judgment (Dkt. Nos. 45, 56). Plaintiff Judith Beasley seeks retirement disability benefits under defendant Raytheon Aircraft Corporation's ("RAC") employee plan. She also argues that defendants improperly denied her disability benefits application forms in violation of ERISA. In response, defendants argue that Ms. Beasley is not entitled to disability benefits because she was not a RAC employee when she applied and qualified for disability benefits. Further, defendants argue that the court should only consider evidence submitted to the review committee and should apply the traditional summary judgment standard of review in this case. After reviewing the parties' arguments, the court finds in favor of defendants.

## I. STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgments as a matter of law.  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party.  Jurasek v. Utah State Hosp., 158 F.3d 506, 510 (10th Cir. 1998).   The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  Baker v. Board of Regents, 991 F.2d 628, 630 (10th Cir. 1993).  The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance.  Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319, 1323 (10th Cir. 1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in Matsushita).  The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

## II. FINDINGS OF FACT

In keeping with the standards governing summary judgment, the following facts are uncontroverted or, when controverted, are viewed in the light most favorable to the plaintiff.  The

court has omitted immaterial facts and factual averments not supported by the record.

Plaintiff Judith Beasley worked for RAC from April 19, 1973 through March 29, 2002. Throughout her employment, Ms. Beasley was assigned to hourly-compensated positions governed by the collective bargaining agreement between RAC and the International Association of Machinists and Aerospace Workers ("IAM").

Defendant RAC is a manufacturer of aircraft for general aviation and military use. RAC is the Plan sponsor, and provides all funding for the plan. Defendant Raytheon Aircraft Company Retirement Income Plan for Hourly Paid Employees ("the Plan") is the Plan that governs the retirement benefits payable to eligible hourly employees. The Plan provides benefits only to hourly-compensated employees of RAC.

The Committee is the group responsible for the operation and administration of the Plan. When Ms. Beasley left her employment at RAC in March 2002, the members of the Committee were Frank Clifford, Nita Long, Ray Lagpacan, Aldo Servello, and Wayne Wallace. All were salaried employees of RAC. As of September 2002, when Ms. Beasley was selecting her retirement benefit, the members of the Committee were Wayne Wallace, Nita Long, Toby O'Brien, and Marzella Ervin. All were salaried employees of RAC. The President and CEO of RAC selects all members of the Committee. The Committee members did not receive any additional compensation for their duties relating to the Committee. The performance reviews of the members of the Committee were not affected by their decision to deny benefits.

In September 2004, pursuant to Article 11.02(a)(7), administrative functions for the Plan were delegated to The Raytheon Benefit Center. Effective June 1, 2005, the amendment to the Plan dissolved RAC Pension Committee. On the same date, the Benefits Appeal Committee of

Raytheon Company (RAC's parent company) was appointed as the Committee under Section 11.01 of the Plan.

The voting members of the Benefits Appeal Committee of Raytheon Company are Norm Pao, Diane Avellar, and Gerard Gasperini.  Ched Miller is the non-voting secretary for the Committee. All are salaried employees of Raytheon Company, and are not participants or beneficiaries of the Plan.  The members of the Benefits Appeal Committee of Raytheon Company are selected and appointed by the Senior Vice Presidents in the areas of Finance, Legal, and Human Resources.  None of the Committee members receive additional compensation for performance of those duties.  The Committee members' benefit decisions do not affect their performance reviews.  Raytheon Company does not fund the Plan.

**A. Plaintiff's Voluntary Layoff**

Ms. Beasley had "vesting service," by the Plan terms, of more than twenty-eight years of employment with RAC.  During Ms. Beasley's last year of employment with RAC, her health deteriorated to the point she decided to leave her employment with RAC in an attempt to improve her health sufficiently for her to return to RAC.

In March 2002, Ms. Beasley determined that she wanted to take a voluntary layoff.  Ms. Beasley's voluntary layoff was not in accordance with Article 5, Section 6(j) of the collective bargaining agreement with the IAM, and thus required RAC's approval.  Ms. Beasley submitted her request for a voluntary layoff, and was informed that the company had approved her request.  Ms. Beasley's last day worked was March 29, 2002.  At the time she took the voluntary layoff, Ms. Beasley was fifty-six years of age.

**B. Plaintiff Could Have Taken a Medical Leave of Absence of Up to Twelve Months**

Ms. Beasley was aware she could take medical leaves of absence.  Earlier in her employment, Ms. Beasley had twice taken medical leaves of absence for a back surgery and for a hysterectomy, and then returned to work.  However, Ms. Beasley states she was not aware that she could have taken a medical leave of absence on March 29, 2002, rather than a voluntary layoff.  She notes that when she left RAC on March 29, 2002, she intended to return but was not sure if she could return if she took a medical leave of absence.  She notes that whether to grant a medical leave of absence is in the discretion of RAC.

Company policies allow for medical leaves of absence for up to twelve months in a twenty-four month period.  An RAC employee who is on a medical leave of absence continues to be carried on the company's active employee list.

**C. Early Retirement Benefits Available to Plaintiff**

Having been employed by RAC for more than five years, Ms. Beasley was vested in the company's retirement plan for hourly employees.  The retirement benefits are structured so that a vested employee is entitled to one hundred percent of the benefit if they retire at age sixty-two or older.  A retired employee, however, may seek benefits as young as age fifty-five.  Employees who seek retirement benefits when they are younger than sixty-two receive a reduced amount. The following schedule applies:

5

| Age at Which Employee Elects Benefits to Commence | Percentage of Accrued Benefit Payable |
|---|---|
| 62 or over | 100% |
| 61 | 90% |
| 60 | 80% |
| 59 | 70% |
| 58 | 65% |
| 57 | 60% |
| 56 | 55% |
| 55 | 50% |

Article 5.04 of the Plan allows a participant to receive an early retirement benefit commencing at the early retirement date, or at the first of any month thereafter and before the normal retirement date, in a reduced amount. The collective bargaining agreement also contains the percentage reduction that will be applied in the event of early retirement. The agreement advises employees to see the current retirement booklet for the details of the retirement program.

Although Ms. Beasley had consulted with persons in the Human Resource Department regarding other matters, she made no attempt to discuss with Human Resources what effect a voluntary retirement at age fifty-six would have on her retirement benefits.

**D. Plaintiff's Selection of Retirement Benefits**

The parties controvert whether Ms. Beasley contacted RAC between her voluntary layoff on March 29, 2002, and September 18, 2002. RAC states that there was no contact while Ms. Beasley states she contacted Debbie Condon in April 2002 about disability benefits. Regardless, on September 18, 2002, Ms. Beasley contacted RAC's benefits group to gather information about what her retirement benefit would be if she determined that she wanted to start drawing benefits.

6

At the time of the September 18, 2002 contact, Ms. Beasley asked Debbie Condon if she was eligible for disability retirement benefits.  According to Ms. Beasley, Debbie Condon told her that she was not eligible for benefits because she was not on RAC's active payroll.

According to RAC's own records, Ms. Beasley requested application forms for disability retirement at least as early as September 2002.  RAC made the following entry:

> On 3/29/2002, she volunteered for layoff from RAC.  She reports having requested an application for Disability Retirement under the RAC Hourly Plan several months later, but Debbie Condon told her (correctly, I believe) that, since she was no longer an active employee, she was not eligible for a disability retirement. See her e-mail to Jim Schuster of 11/2/2002.

> On April 11, 2002, Ms. Beasley applied for a disability Social Security Pension.  A (sic) being told of her ineligibility for a Disability Pension under that pension plan, in September, 2002, Ms. Beasley requested the information necessary to elect early retirement. On September 27, 2002 she completed her application for early retirement.

(Pl.'s Ex. 1 at 1485).

Ms. Beasley contacted RAC again on September 24, 2002, and indicated that she wished to begin drawing retirement benefits as of November 1, 2002.  On September 24, 2002, Debbie Condon, who worked in Retirement Benefits, wrote to Ms. Beasley, enclosing information about the various retirement options that were available to her.

The early retirement benefit options that were available to Ms. Beasley included:  1) a life annuity that pays a particular amount to the retiree, with no payment to a beneficiary; 2) an automatic joint and surviving spouse annuity which pays the retiree a particular amount for the retiree's lifetime, with a surviving spouse to receive one-half of the amount for the remainder of his lifetime; 3) a life annuity with five years certain, which would pay a set amount to the retiree for her lifetime, and if she died within five years, the remainder of the sixty months of benefits

7

would be paid to a named beneficiary; and 4) a life annuity with ten years certain, which would

pay the retiree a particular amount for the retiree's lifetime, and if she died within ten years, the

remainder of the 120 months of benefits would be paid to a designated beneficiary.  The

automatic joint and surviving spouse annuity is the automatic selection for a married retiree,

unless the retiree's spouse consents in writing to another selection.

Ms. Beasley returned a Retirement Data Sheet signed by her and her husband.  On

October 7, 2002, Debbie Condon returned Ms. Beasley's Retirement Data Sheet, because Ms.

Beasley had not selected any of the retirement options.  On October 10, 2002, Ms. Beasley

returned the Retirement Data Sheet, having selected the fifty percent joint and surviving spouse

annuity.

The Retirement Data Sheet completed by Ms. Beasley:

I certify that all information given above is true and correct to the best of my knowledge.
The available options have been explained to me, I understand them, and I have elected
the option indicated to become effective as of the above retirement date. ***I understand
that I cannot change my election after that date***.

(Revised Retirement Data Sheet, Def. Ex. 14) (emphasis added).  The retirement date selected by

Ms. Beasley was October 31, 2002.  Ms. Beasley was age fifty-seven as of her selected

retirement date, and thus, pursuant to the early retirement schedule, would be entitled to only

sixty percent of the full retirement benefit.

Pursuant to Ms. Beasley's selection, the Plan commenced payments to Ms. Beasley of

$621.65 per month. The payments began on November 1, 2002, and will continue throughout

Ms. Beasley's lifetime.  If Ms. Beasley's spouse survives her, he will receive $310.83 per month

for life, in addition to his own retirement benefits.  Ms. Beasley received her first early retirement

benefit payment on November 1, 2002.

**E. Plaintiff's Contacts with RAC Regarding Retirement Benefits**

On November 2, 2002, Ms. Beasley e-mailed Jim Schuster, RAC's President and CEO. In the e-mail message to Schuster, Ms. Beasley stated that, a few months *after* she took the voluntary layoff, she contacted Debra Condon to see if she could take a "medical retirement." (November 2, 2002 E-Mail from Plaintiff to Jim Schuster, Def.'s Ex. 15).  According to Ms. Beasley, Condon told her that she could not because she was not on the active employee list at the time.  Ms. Beasley also complained that she had not received the engraved clock usually given to retiring employees.  Jim Schuster forwarded the e-mail to Nita Long, and Ms. Long saw to it that Ms. Beasley received a clock.

On November 27, 2002, Ms. Beasley's then lawyer wrote to Debbie Condon, stating that Ms. Beasley would "take whatever steps necessary to secure disability retirement benefits previously denied by Raytheon." (Letter from O. Ronald McGee dated November 27, 2002, Def.'s Ex. 17).

On April 15, 2003, Nita Long wrote to Mr. McGee, informing him that, in order to be eligible for disability retirement under the Plan, the applicant must be an active employee at the time of application and must have been approved for disability benefits through the Social Security Administration ("SSA") prior to leaving RAC.

**F. Plaintiff's Application for Social Security Benefits**

Unbeknownst to defendants, Ms. Beasley began applying for Social Security disability benefits on April 11, 2002, approximately two weeks after she left her employment with RAC. The SSA determined that Ms. Beasley was disabled as of March 29, 2002.  Because of the

9

regulatory waiting period, Ms. Beasley began receiving her first month of entitlements to benefits in September 2002, five months after she submitted her application, and six months after she took voluntary layoff.

The parties controvert whether Ms. Beasley could have taken a medical leave of absence rather than a voluntary layoff. Although RAC contends that Ms. Beasley could have taken a medical leave and the company regularly approves medical leaves of absence of up to a year, Ms. Beasley notes that there was no guarantee she would have been approved for leave. Further Social Security claims may take several years, and there is no assurance that Ms. Beasley would have been an active employee when her disability application was approved.

### G. Plan Summary

A summary of the Plan provides the following instructions for a claimant to submit an application for disability retirement benefits:

Important Information<br>
Applying for<br>
Disability Retirement Benefits

If you are totally and permanently disabled and will **not** be returning to work for several months, you may want to complete and return the enclosed disability retirement form as soon as possible to apply for disability retirement benefits. **Please note that the approval for Total and Permanent Disability is based on whether you are eligible for Social Security disability benefits.**
. . .
**Non-work related disability**
If your disability does not occur as a result of a work-related illness or on-the-job injury, but you have 10 years or more vesting service and you are in Active Employment on the date disability occurs, you will receive disability benefits as of the latter of the first day of the seventh month following your disability or the first day of the month after you file a proper application for disability retirement. In connection with such a disability retirement application, you must provide proof of your eligibility to receive social security disability benefits under the Social Security Act in effect at the date of disability.

(Pl.'s Ex. 1 at 1308) (emphasis in original).

**H. Pertinent Plan Provisions – Committee Discretion**

The Plan, at Article 11, establishes a Committee of at least three members. At the time Ms. Beasley sought and was denied disability retirement benefits, the Benefits Appeal Committee of Raytheon Company was serving as the Committee.

The Plan provides broad powers for the Committee, including "full power to administer the Plan and to construe and apply all of its provisions on behalf of the Employer." (The Plan, Def.'s Ex. 2 at 68, Article 11, Section 11.02 (a)). The Committee has the power to "decide all questions of law and fact with respect to the Plan, including but not limited to, eligibility, continuity of employment, and amounts of benefits. (The Plan, Def.'s Ex. 2 at 68, Article 11, Section 11.02 (a)(2)). The Committee also has power to "make final decisions regarding all disputes that may arise with regard to the rights of Employees, Participants and their legal representatives. . . . " (The Plan, Def.'s Ex. 2 at Section 11.02(a)(3)).

Ms. Beasley does not dispute that the Committee has full power and discretion to administer the Plan. The Plan provides that "any action on matters within the discretion of the Committee will be conclusive, final, and binding upon all Participants in the Plan and upon all persons claiming any rights, including Beneficiaries." (The Plan, Def.'s Ex. 2 at 71, Article 11, Section 11.06).

**I. Pertinent Plan Provisions – Disability Retirement Income**

Article 4, Section 4.01 of the Plan states: "[a] Participant who has reached his Retirement Date shall be entitled to retire and receive benefits in accordance with Article 5." (The Plan, Def.'s Ex. 2 at 27, Article 4, Section 4.01).

Article 1, Section 1.60 defines "Retirement Date" as: "a Participant's Normal, Early, Postponed or Disability Retirement Date" (The Plan, Def.'s Ex. 2 at 13, Article 1, Section 1.60).

"Normal Retirement Date" is defined as: "the first day of the month following the month in which he attains his 'Normal Retirement Age.'" (The Plan, Def.'s Ex. 2 at 9, Article 1, Section 1.45).

"Normal Retirement Age" is defined as: "the later of (a) the date a Participant attains age 65, and (b) the fifth anniversary of the date he first performed an Hour of Service for the Employer. . ." (The Plan, Def.'s Ex. 2 at 9, Article 1, Section 1.43).

"Early Retirement Date" is defined as: "the first day of the calendar month coincident with or next following the Participant's Termination Date, if such date is earlier than the Participant's Normal Retirement Date, provided that the Participant's Termination Date falls on or after the participant's fifty-fifth (55th) birthday, and provided that the Participant has completed five years of Credited Service . . . ." (The Plan, Def.'s Ex. 2 at 5, Article 1, Section 1.23).

"Termination Date" is: "the date on which an Employee ceases Active Employment with the Employer. . . ." (The Plan, Def.'s Ex. 2 at 5, Article 1, Section 1.63).

"Postponed Retirement Date" is defined as: "the first day of the calendar month next following the Participant's Termination Date, if such date is later than the Participant's Normal Retirement Date" (The Plan, Def.'s Ex. 2 at 12, Article 1, Section 1.55).

The Plan does not contain a definition for "Disability Retirement Date." (The Plan, Def.'s Ex. 2, Article 1, generally).

Article 5, Section 5.07 provides:

12

A Participant who has incurred a Total and Permanent Disability ***during Active Employment while an Employee*** of a Participating Employer shall be entitled to a Disability Retirement Benefit of a monthly annuity for life, commencing on the first day of the month following his eligibility date in an amount equal to his Accrued Benefit at his Termination Date . . . ."

(The Plan, Def.'s Ex. 2 at 34, Article 5, Section 5.07) (emphasis added).

Effective January 1, 2002, the Plan was amended.  The term "Total and Permanent Disability" was defined as:

a disability resulting from sickness, accident, ill health or other physical or mental causes which prevents a Participant from performing and discharging the duties of suitable employment. ***A Participant shall be deemed to be totally and permanently disabled only if the period of disability shall have continued for*** at least two consecutive months in the case of a work-related disability (either a work-related illness or an on-the-job injury) or ***at least six consecutive months in the case of a non-work-related disability and if the disability will be permanent and continuous during the remainder of his life. The existence of Total and Permanent Disability shall be established based on evidence that the Participant is eligible for disability benefits under the Social Security Act in effect at the date of disability.***

(Amendment No. Two, Def.'s Ex. 21)(emphasis added).

Article 1, Section 1.28 defines the term "Employee":

[A]ny person who is expressly designated as an employee on the books and records of the Affiliated Employer and who is treated as such by the Affiliated Employer for federal employment tax purposes. . . .

(The Plan, Def.'s Ex. 2, at 6, Article 1, Section 1.28).

"Active Employment" is defined as:  "all periods of time . . . occurring between the Employee's Employment Commencement Date . . . and ending on the Severance from Service Date . . . ." (The Plan, Def.'s Ex. 2 at 18, Article 2, Section 2.02(a)).

"Severance from Service" is defined as:

the earlier of . . . (a) the date on which the Employee ceases to be employed by each Employer and Affiliated Employer because the Employee quits, retires, is discharged or

dies [or] (b) [t]he first anniversary of the first day of a period in which the Employee remains absent from employment (with or without pay) with each Employer and Affiliated Employer for any reason other than those specified in paragraph (a) of this section. . . .

(The Plan, Def.'s Ex. 2 at 13, Article 1, Section 1.61 (a) and (b)).

Article 2, Section 2.01 states the definition for an employee's Period of Service.  That provision states, in pertinent part: "[A]n Employee's Period of Service shall mean the sum of all periods of service identified under subparagraphs (1), (2), and (3) below . . . . (1) The period commencing on the Employee's Employment Commencement Date and ending on the Employee's Severance from Service Date. . . ."  (The Plan, Def.'s Ex. 2 at 16, Article 2, Section 2.01(a)(1)).

Article 9 of the Plan limits changes to benefits selection to the period of time prior to the "Benefit Commencement Date."

"Benefit Commencement Date" is defined as: the first day of the first period (e.g. month, quarter, year) for which a benefit is payable to an individual, even though the first payment may not actually have been made at that date.  (The Plan, Def.'s Ex. 2 at 3, Article 1, Section 1.10). Ms. Beasley controverts this paragraph to the extent it implies that Article 9 of the Plan imposes a time limit on the selection of disability retirement benefits or early retirement benefits.  Article 9 applies to the form of benefits a claimant will receive once she "become[s] entitled to commence receiving payments of an Early, Normal, Postponed or Disability Retirement Benefit or of a Deferred Vested Benefit . . . ." [Article 9, §9.01] Article 9 does not provide a bar to a claimant changing from one benefit, to which she is entitled, to another, to which she is entitled.

The Retirement Data Sheet, the form by which retirees notify the plan administrators as to

which pension option they have selected, includes a certification stating, "I understand that **I cannot change my election** after [the retirement date]." (Revised Retirement Data Sheet, Def.'s Ex. 14) (emphasis added).

**J. Plaintiff's Application for Benefits – Documents Presented to Administrators**

On July 29, 2003, Ms. Beasley filed suit in the Western District of Oklahoma, alleging a violation of ERISA.  On defendants' motion, the case was transferred to this district.  Defendants raised as an affirmative defense Ms. Beasley's failure to exhaust administrative remedies.  The court stayed these proceedings so that Ms. Beasley could exhaust her administrative remedies.

On or about March 25, 2005, Ms. Beasley submitted an application for disability retirement benefits.  In support of her application, Ms. Beasley submitted a physician's certification, stating that she suffers from moderately severe disc disease and chronic back pain, severe irritable bowel syndrome, and major depression.

Ms. Beasley also submitted to the Committee her Application for Social Security Disability Insurance Benefits, dated April 11, 2002.  Ms. Beasley provided the last page of a four-page letter from the SSA, which stated that she was entitled to monthly disability benefits, as of September 2002.  The letter states that the date of onset of the disabling condition was March 29, 2002.

Ms. Beasley also provided a copy of her completed Retirement Data Sheet, showing her last day worked as March 29, 2002.

At the time of the application, the Raytheon Benefit Center was performing administrative services.  The Center denied the application on the grounds that Ms. Beasley was already receiving her early retirement pension, and that payment of that benefit satisfied the

requirements of Article 5 of the Plan.  A letter reflecting the decision was provided to Ms. Beasley.

On May 12, 2005, Ms. Beasley appealed the determination.  The Benefit Appeals Committee of Raytheon Company considered the appeal, and on August 1, 2005, it denied the appeal.

**K. The Committee's Determination**

The May 2, 2005 letter from the Raytheon Benefit Center states that the decision to deny Ms. Beasley's claim for disability retirement benefits was based on Articles 4 and 5 of the Plan.

The Raytheon Benefit Center interpreted Section 4.01 of the Plan, and concluded that it provides that "a participant who has reached his Retirement Date shall be entitled to retire and receive benefits in accordance with Article 5." (Letter From Raytheon Benefit Center Dated May 2, 2005, Def.'s Ex. 27).  The Center also concluded that "Section 5.04 of Article 5 states at the election of the Participant, the participant may receive his early retirement benefit as an annuity commencing at his Early Retirement Date or the first of any month thereafter and before his Normal Retirement Date."  The Center noted that Ms. Beasley had begun collecting her early retirement benefit on November 1, 2002, and thus was already receiving a benefit under Article 5.

After consideration of Ms. Beasley's appeal, the Benefit Appeals Committee of Raytheon Company stated:

> [T]he use of the word 'or' in the context of its use in Section 4.01 in connection with retiring and receiving benefits, indicates that the Retirement Date may be any one of the dates in the list, but it may only be one of those dates. In the case of Ms. Beasley, that date was her Early Retirement Date (as defined in Section 1.23), because that is the date as of which she chose to begin receiving her Early Retirement Benefit.

16

. . .

Even if there could be more than one Retirement Date, the Plan does not provide for a change in the benefit election after a benefit has begun to be paid. This is consistent with the similar rule applicable to optional forms of benefits. Section 9.03 specifies that any change to a participant's election of an optional form of benefit must be made before the Benefit Commencement Date, as defined in Section. 1.10. Section 9.04 provides that any change in election (before the Benefit Commencement Date) must be made in accordance with rules established by the plan administrator. These provisions support the conclusion that a participant may not change a chosen form of benefit after the Benefit Commencement Date.  Ms. Beasley's Benefit Commencement date was November 1, 2002. She does not have the right to change her choice of benefit after that date.

(Letter From Raytheon Benefit Appeals Committee Dated August 1, 2005, Def.'s Ex. 28).

**K. Plaintiff's Request for Information from RAC**

In addition to Ms. Beasley's request for disability retirement application forms in September 2002, Ms. Beasley made the following requests to defendants concerning disability retirement:

1) Ms. Beasley sent an e-mail to James Schuster, an RAC official on November 2, 2002 stating that she had terminated her employment at RAC because she wasn't physically able to continue working at RAC, that she wasn't advised of her options at the time of her termination, and that after her termination when she attempted to apply for disability retirement, she was "informed that [she] couldn't because she wasn't on 'the active list.'"

2) A request through her then-attorney, O. Ronald McGee, dated November 27, 2002 and received February 23, 2003, to "secure disability retirement benefits . . . ." (Pl.'s Ex. 1  at 1463).

3) During or about January 2005, defendant's counsel directed Ms. Beasley to apply for benefits with MetLife.  However, MetLife only administered RAC's short term disability plan and has no involvement with retirement disability benefits.

17

4) Ms. Beasley personally contacted the Raytheon Benefit Center, at the suggestion of RAC's counsel, on February 17, 2005.

5) A request for disability retirement application forms by Ms. Beasley's attorney on March 17, 2005.

On the following occasions, defendants advised Ms. Beasley that she was not eligible for disability retirement benefits because she did not apply for and obtain SSA disability benefits before she took voluntary layoff from her employment with RAC:

1) In a letter to Ms. Beasley's then-attorney on April 15, 2003;

2) In a verbal statement by Debbie Condon in April and September 2002;

3) In a letter dated November 12, 2004 from defendant's counsel;

4) In a letter dated April 15, 2003 from Nita Long, "Director - Compensation and

Benefits." [Pl.'s Ex. 1 at 1464]

The defendants first provided application forms for disability retirement to Ms. Beasley by letter dated March 17, 2005. On March 25, 2005, Ms. Beasley applied for disability retirement under the Plan. Ms. Beasley's application was denied on May 2, 2005. On August 1, 2005, Ms. Beasley's appeal was denied. The parties agree that Ms. Beasley has exhausted her administrative remedies.

**L. Plaintiff's Contentions in this Lawsuit**

Ms. Beasley's position is that she is eligible under the Plan and should receive disability retirement benefits. Ms. Beasley contends that defendants have created an insurmountable precondition to receiving disability retirement benefits, that being qualifying for Social Security disability benefits while still an active employee.

18

Since the 2002 amendment to the Plan, which established qualification for Social Security disability benefits as a prerequisite to receiving disability retirement benefits under the Plan, there have been fifty-three employees who met the qualifications, and who are now receiving the disability retirement benefits.  Those employees met the Social Security disability qualification requirements while on medical leave of absence from RAC, and thus qualified for benefits under the Plan.

Ms. Beasley also contends that defendants violated ERISA by failing or refusing to provide requested information and disability retirement application forms to Ms. Beasley in a timely fashion.

## III. ANALYSIS

### A. Information to be Considered by the Court

Ms. Beasley submitted to the court affidavits and documents that were not a part of the reviewing Committee's record.  Defendants urge the court not to consider these documents, arguing that the court's review should be limited to the record.  Although defendants object to plaintiff's use of additional documents, they proceed to include a number of documents that the Committee did not review.  The contradiction in defendants' position is obvious.

To provide a complete and fair analysis, the court considered the parties' additional documents in evaluating the procedural history of this case.  However, the court rests its decision on the Committee's interpretation in denial of benefits to determine whether there is a violation of ERISA.  Hall v. UNUM Life Ins. Co. of Am., 300 F.3d 1197, 1201 (10th Cir. 2002) (noting that federal courts are limited to the "administrative record"– the materials compiled by the administrator in the course of making his decision). The supplemental documents are relevant

only to provide an administrative backdrop to the events.  See Caldwell v. Life Ins. Co. v. North

America, 165 F.R.D. 633 (D. Kan. 1996) (noting in the context of discovery that evidence of the

merits of a claim may be precluded for but not on whether the fiduciary or administrator fulfilled

his fiduciary role in obtaining the necessary information in order to make his determination;

whether the persons who assisted in compiling the record followed proper procedure; and

whether the record is complete).

**B. Standard of Review for ERISA and Committee's Determination**

Ms. Beasley argues that a de novo standard of review applies to this case whereas

defendant argues that the court should apply an arbitrary and capricious standard since there is no

inherent conflict.  The court applies the latter standard.

In Panther v. Synthes (U.S.A.), 380 F. Supp.2d 1198 (2005), 1206-1207 (D. Kan. 2005),

the court noted "[a] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a

de novo standard unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire

& Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).  Where the

administrator has discretionary authority, an arbitrary and capricious standard of review applies

to administrator's decision.  Panther, 380 F. Supp.2d at 1207 (citing Charter Canyon Treatment

Ctr. v. Pool Co., 153 F.3d 1132, 1135 (10th Cir. 1998) (citation omitted)).  "Under this standard

of review, the court generally considers only 'the arguments and evidence before the

administrator' at the time of the decision."  Id. (citing Sandoval v. Aetna Life & Cas. Ins. Co.,

967 F.2d 377, 380 (10th Cir. 1992)).  "The Administrator's decision need not be the only logical

one or even the best one.  It need only be sufficiently supported by facts within his knowledge to

counter a claim that it was arbitrary or capricious.  The decision will be upheld unless it is not

grounded on any reasonable basis."  Id.; Kimber v. Thiokol, 196 F.3d 1092, 1098 (10th Cir.

1999) (alterations, quotations, and citations omitted).

The Tenth Circuit recently modified the standard for cases of inherent conflict of interest.

On August 13, 2004, the Tenth Circuit Court of Appeals issued Fought v. UNUM Life Ins. Co.

of America, 379 F.3d 997 (10th Cir. 2004) (hereafter "Fought II").  The decision vacated an

earlier order in Fought v. UNUM, 357 F.3d 1773 (hereafter "Fought I") and clarified the standard

for reviewing denials of disability benefits where the plan administrator operates under an

inherent conflict of interest.  Fought II, 379 F.3d at 998.  In Fought II, Shirley O. Fought

continued her challenge of her insurer's denial of disability benefits under her employee's group

disability plan.  Fought II, 379 F.3d at 999.  Ms. Fought's policy did not cover pre-existing

conditions that "caused," "contributed to," or "resulted" in disability.  Id.  Based on this

language, UNUM's plan administrator denied Ms. Fought coverage.  Id.  UNUM admitted to a

conflict of interest as both payer and administrator of the plan.  Id.  In its review, the Tenth

Circuit reversed and remanded the district court's grant of summary judgment in favor of the

plan administrator.  Id. at 997.  The Tenth Circuit held that the plan administrator had not

established by substantial evidence that claimant's complications from surgery for a pre-existing

condition were not covered by the group disability plan.  Id. at 997.

In issuing its revised standard, the court outlined two standards:  one for a standard

conflict of interest case and another for an inherent conflict of interest case.  Id. at 1005-1006.

For standard conflict of interest cases, the plaintiff is required to prove the existence of the

conflict.  Id. at 1005.  Plaintiff must show " 'proof that the plan administrator's dual role

jeopardized his impartiality.' " Id. at 1005 (citations omitted).  The court was careful to note that:

> [T]he mere fact that the plan administrator was a [company] employee is not enough per se to demonstrate a conflict. Rather, a court should consider various factors including whether: (1) the plan is self-funded; (2) the company funding the plan appointed and compensated the plan administrator; (3) the plan administrator's performance reviews or level of compensation were linked to the denial of benefits; and (4) the provision of benefits had a significant economic impact on the company administering the plan. [citations omitted].  If the plaintiff cannot establish a serious conflict of interest, we consider defendant's standard conflict of interest as one factor in determining whether defendant's denial of disability benefits to plaintiff was arbitrary and capricious.

Id. (citing Cirulis v. UNUM Corp., 321 F.3d 1010, 1017 n. 6 (10th Cir. 2003) (quotation omitted).

     As for inherent conflict of interest cases, the Tenth Circuit recognized that they may exist in several circumstances: 1) where the plan administrator operates as both the insurer and administrator; 2) where there is a proven conflict of interest; or 3) when a serious procedural irregularity exists and the plan administrator has denied coverage.  In these cases, the Tenth Circuit evaluated the specific obligations of both the plan administrator and the court.  First, the plan administrator must demonstrate: 1) that its interpretation of the terms of the plan is reasonable; and 2) that its application of those terms to the claimant is supported by substantial evidence.  Id. at 1008.  Second, the court must take a "hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest."  Id.  In adopting this burden-shifting standard, the court explicitly rejected the application of Kimber in cases of inherent conflict of interest.  Id.  However, the standard in Kimber remains available where a plaintiff cannot establish a serious conflict of interest.  See Fought, 379 F.3d at 1005.

22

Here, the Plan places discretion in the hands of the plan administrator to determine whether to award benefits.  This will normally warrant an arbitrary and capricious standard of review.  The next issue is whether there is an inherent conflict of interest that requires a less deferential standard of review to be applied.  The parties dispute what standard should apply here.  Ms. Beasley argues that the plan sponsor and employer funds the Plan, which in this case is RAC.  Ms. Beasley notes that the Plan provides for Committee administration, whose members are appointed by the president of RAC.  Therefore, Ms. Beasley argues that there is an inherent conflict of interest.  Additionally, Ms. Beasley argues that there was a serious procedural irregularity when her application was not reviewed on its merits.  On the other hand, defendants argue that the Committee members reviewing benefits are salaried employees who do not contribute to the Plan.  Defendants note that although RAC employs the Committee members, RAC does not fund the Plan and thus members do not have an inherent conflict.

Based on the uncontroverted facts, RAC is a plan sponsor and provides all funding for the Plan.  Although Committee members do not contribute to the Plan, they are appointed by RAC's president.  Despite attempts to insulate itself by using salaried employees, RAC functions as an insurer and administrator.  Yet, Ms. Beasley has not shown that this court must apply an inherent conflict of interest standard.  Ms. Beasley has not shown whether Committee members' compensation is linked to denial of benefits.  Smith v. Metropolitan Life Ins. Co., 344 F. Supp.2d 696, 702 (D. Colo. 2004) (recognizing that a "theoretical conflict of interest is not so significant as to warrant such a change in standard or scope of judicial review.").  See Kimber, 196 F.3d at 1098.  Ms. Beasley has also not shown whether benefits had a significant economic impact on the company administering the plan.  Smith, 344 F. Supp.2d at  702 (noting that "where the

potential total benefits payout is not substantial compared to the financial assets of the insurer, the significance of any conflict is minimal."). <u>See</u> <u>Chalmers v. Quaker Oats Co.</u>, 61 F.3d 1340, 1344 (7th Cir. 1995). Under these circumstances, Ms. Beasley cannot establish a serious conflict. The court considers defendants' conflict of interest as one factor in determining whether defendants' denial of disability benefits to plaintiff was arbitrary and capricious. The court does not address the issue of whether there are procedural irregularities since Ms. Beasley failed to develop this argument.

In applying the standard conflict of interest approach, the court applies the arbitrary and capricious standard of review to the Committee's interpretation and denial of benefits, acknowledging a conflict as one factor but not requiring a shifting of burden. Using this standard, the court finds that plaintiff's denial of benefits was reasonable. Here, the Plan clearly stated that an insured would qualify for total and permanent disability benefits "only if the period of disability shall have continued for...at least six consecutive months in the case of a non-work-related disability." A person who qualifies for social security benefits qualifies for total and permanent disability benefits. Although Ms. Beasley's date of disability was the last date of her employment, she applied for social security benefits only after she left RAC on voluntary layoff. Thus, Ms. Beasley was an employee on her date of disability, but she did not meet the six months of disability requirement as an active employee.

In the alternative, the Committee noted that even if the date of her voluntary layoff were not used, the Plan does not permit change in benefits election after a benefit has begun to be paid. Based on the Plan terms, Ms. Beasley could not change her retirement benefits after November 1, 2002, when she began receiving her payments.

24

Evaluating the conflict as one factor, the court finds the Committee's interpretation to be reasonable. RAC employees provided a consistent and coherent interpretation of when an employee may be eligible for disability retirement. The Plan requires the insured be an active employee, qualify for approval from the SSA, and have six consecutive months of disability. When meeting these requirements, defendants require the insured to be in active status, though possibly on a leave of absence, during the filing and approval of disability benefits. Since Ms. Beasley had taken retirement before she applied and qualified for disability, she did not qualify. These are reasonable and appropriate guidelines instituted in Plan administration because plaintiff may retain the benefits of employment only if she is still somehow in active status. Once Ms. Beasley took voluntary layoff, she changed her employment status and was not entitled to the relevant benefits.

Ms. Beasley argues for an alternate interpretation of the Plan terms. This, however, is inappropriate. The applicable standard of review requires this court to uphold reasonable Committee interpretations. The fact that plaintiff presents a plausible alternative interpretation is not a basis for overturning the Committee's decision. Kimber, 196 F.3d at 1098 (finding that the administrator's decision need not be the only logical one or even the best one). Additionally, Ms. Beasley asks the court to speculate as to what would be the outcome if she had taken medical leave and not received coverage within the period of leave. The court will not indulge in these "what ifs" because they are not the facts before this court. There may be Plan provisions that address these circumstances, which the parties have not had reason to bring to the court's attention.

**C. Benefits Application Form**

The parties dispute whether defendants violated ERISA in denying Ms. Beasley copies of the benefits application form.  Ms. Beasley contends that failure to provide her disability retirement application forms was a violation of the statute.  She claims she filed a timely complaint within three years of the alleged violation.  Defendants argue that they had no obligation to provide disability forms and the applicable time limit is only one year.  The court finds in favor of defendants.

Since Section 1132 of ERISA contains no statute of limitations, federal courts look to state law to determine the appropriate time period for commencing suit.  Damon v. Unisys Corp., 841 F. Supp. 1094 (1994), 1096-1097 (D. Colo. 1994) (citations omitted).  Where no state counterpart exists, the court looks to the state action most analogous to the federal claim.  Id. at 1097 (citing Auto Workers v. Hoosier Corp., 383 U.S. 696, 704-06, 86 S.Ct. 1107, 1112-14, 16 L.Ed.2d 192 (1966)).  The nature of the federal claim and policies involved should guide the court in determining which limitations period is appropriate.  Id. (citations omitted).

Ms. Beasley argues that Kan. Stat. Ann. § 60-512(2) with its three-year limit applies to this action.  Ms. Beasley cites Alexander v. Certified Master Builders Corp., 268 Kan 812, 819, 1 P.3d 899 (2000) for the proposition that the nature of right rather than the remedy determines the applicable statute of limitation.  In Alexander, the Kansas Supreme Court applied a three-year statute of limitation to an action under the Kansas Consumer Protection Act ("KCPA").  Id. at 812.  If the court were to apply a one-year statute of limitations, plaintiff urges the court to toll the limitations until plaintiff received the requested forms.

26

Plaintiff's cited case is distinguishable.  First, the case involved KCPA rather than ERISA. Second, the case specifically noted that a one-year statute of limitations applied in cases where the legislature had provided for a separate penalty in addition to a damage recovery.  Id. at 824.  Here, Ms. Beasley seeks disability benefits as well as a statutory penalty.  Thus, the court applies the one-year statute of limitations found in Kan. Stat. Ann. § 60-514(c).  A Colorado court has also applied a similar one-year limitation.  Damon, 841 F. Supp at 1094 (applying a one-year statute of limitations under Colorado law to an insured's ERISA claim for administrator's failure to comply with request for information).

Plaintiff's argument regarding the tolling of the statute of limitations is also without merit.  In Damon, the insured argued that each request for a copy of the ERISA plan and medical records caused the statute of limitations to accrue.  Id. at 1098.  The U.S. District Court of Colorado found that the insured's claim arose after his first request for information.  Id.  The same reasoning applies here.  Ms. Beasley's cause of action accrued after her first request for information.   There is also no credible evidence that Ms. Beasley was deceived and lulled into inaction.  Richardson v. Frank, 975 F.2d 14333 (10th Cir. 1991) (permitting equitable tolling in Title VII case if employer actively deceives or misleads the employee); Aquinaga v. United Food and Commercial Workers Intern. Union, 993 F.2s 1463 (10th Cir. 1993) (applying equitable tolling in claim under Labor Management Relations Act where plaintiffs did not know of secret agreements until after statute of limitations expired).  Ms. Beasley made her request for disability retirement application forms in September 2002, and defendants denied her these forms because she was not an active employee.  After this initial request and denial, Ms. Beasley's claim became fully ripe.  Ms. Beasley did not bring a cause of action for penalties until her first

27

amended complaint on August 2, 2005.  Ms. Beasley brought a claim more than one year after it became ripe, and thus her claim is now time barred.

Since the statute of limitations bars plaintiff's claim, the court does not reach the merits of her allegation.

IT IS ACCORDINGLY ORDERED this 5th day of July 2006, that the court denies plaintiff's Motion for Summary Judgment (Dkt. No. 45) and grants defendants' Motion for Summary Judgment (Dkt. No. 56).

s/ J. Thomas Marten

J. THOMAS MARTEN, JUDGE
